**COLONIAL LINCOLN–MERCURY, INC.; William F. Munday; Charles F. Thomas and B.J. McCombs, Appellants,**

v.

**William O. MUSGRAVE; C.S. Meyers; Borough Lincoln-Mercury, Inc.; Borough Land Corp. and R.B. Borough, Appellees.**

**COLONIAL LINCOLN–MERCURY, INC.; William F. Munday; Charles F. Thomas and B.J. McCombs, Appellants,**

v.

**William O. MUSGRAVE; C.S. Meyers; Borough Lincoln-Mercury, Inc.; Borough Land Corp. and R.B. Borough, Appellees.**

Nos. 83–1057, 83–1657.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1984.

Decided Dec. 3, 1984.

Robert B. Cordle, Charlotte, N.C. (Helms, Mulliss & Johnston, Charlotte, N.C., William T. Green, III, Green, Downey, Patterson & Schultz, Houston, Tex., on brief), for appellants.

Ray S. Farris, Charlotte, N.C. (Elizabeth H. Daniel, Farris, Mallard, Cummings & Booe, P.A., J.W. Alexander, Jr., Blakeney, Alexander & Machen, Charlotte, N.C., on brief), for appellees.

Before RUSSELL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

This diversity action grows out of the sale by appellees and the purchase by appellants of the assets of an automobile dealership and the stock of a related automobile leasing enterprise. After suffering disastrous operating losses immediately following their purchase, the purchasers sued the sellers, principally on claims of common law fraud and securities law violations under Rule 10b–5 of the S.E.C., 17 C.F.R. § 240.10b–5, alleging fraudulent misrepresentations in the negotiations leading to the sale. The sellers counterclaimed for damages allegedly caused by the purchasers' breach of the executory contract of sale. Following trial, the district court set aside a jury verdict awarding more than $500,000 to purchasers on their claims, and granted judgment n.o.v. instead to sellers; and entered judgment in excess of $500,000 in favor of sellers on their counterclaim.

On the purchasers' appeal from both elements of the judgment, we affirm the grant of judgment n.o.v. to sellers on the purchasers' claims, but we vacate and remand for jury trial certain factual issues respecting the amount of damages recoverable on seller's counterclaim.

I

Although, inevitably, the facts underlying this fairly typical commercial deal gone awry are complicated and in critical respects yet disputed, the essential framework can be fairly summarized on the basis of agreed, or nondisputed, elements of the parties' respective statements of fact on this appeal.

Sometime in the Spring of 1979, plaintiff Munday, a Texas resident who owned and operated automobile dealerships in Texas, Kansas and Tennessee and who had been in the general business for upwards of 30 years, heard of and became interested in the possible purchase of the dealership business operated by defendant Borough Lincoln-Mercury, Inc. (BLM) in Charlotte, North Carolina. Following up, Munday came to Charlotte along with plaintiff Thomas and one Hamel, the broker from whom Munday had learned of BLM, to discuss a possible purchase by Munday, Thomas, and plaintiff McCombs of BLM and a related automobile leasing enterprise operated by Borough Leasing Company (BL). At this time defendant R.B. Borough (Borough) was the controlling stockholder in both BLM and BL, and the defendants Musgrave and Myers were minority stockholders in BL.

In Charlotte, Munday, Thomas and Hamel met with Lee Laney, then an officer and minority stockholder in BLM, to discuss the possibility of a purchase of both entities. As a basis for the discussion, Laney provided, among other items, internally prepared financial statements for

1978 operations of both BLM and BL, on standard forms prescribed by Ford Motor Company (Ford financial statements) for certain of its dealerships. A purchase price of net worth plus a "premium" of $600,000 was discussed, but agreement could not then be reached because Borough was away on a trip. A week later, however, following Borough's return, Musgrave reported to Munday that Borough did not wish to sell.

In June of 1979 negotiations were reopened, presumably as the result of an inquiry directly from Munday to Borough. In any event, as a result of a long-distance telephone conversation then had between the two, Munday came again, this time alone, to Charlotte where he met for the first time with Borough and Musgrave on June 13, 1979. Though essential agreement on the purchase price as originally discussed was apparently reached on that first day, two more days of negotiations and drafting of details followed. In these negotiations, lawyers for both sets of parties as well as BLM's auditors participated along with the principals, Munday, Borough, and Musgrave. Again in these discussions and negotiations the 1978 Ford financial statements for both BLM and BL were provided for inspection by Munday and his attorney, along with comparable statements for both entities for 1977 and for BLM for the year 1979 to date. The 1979 interim statement for BLM reflected an operating loss of around $109,000 for the period January through May, a loss that of course had not been reflected in the 1978 statements provided Munday and Thomas in their earlier discussion with Laney. This loss and its significance for operational outlook of the business was discussed by the parties.

Letters of intent incorporating the basic terms of a purchase agreement were executed by the parties on June 15, 1979, and on June 19, 1979, the parties executed a Stock Purchase Agreement with respect to the stock of BL and an Asset Purchase Agreement with respect to the assets of BLM. Formal closing was deferred to a time certain following and dependent upon Ford Motor Company approval of Munday as a Lincoln-Mercury dealer. Following Ford Motor Company's approval of Munday for the dealership, based upon certain assurances as to his residency in Charlotte and his commitment to provide an additional $1,000,000 capitalization of the dealership, the closing took place on August 6, 1979. Pursuant to terms of the two purchase agreements, Munday's new corporation, the plaintiff Colonial Lincoln-Mercury, Inc. (Colonial), paid in cash $86,065.62 for the assets of BLM and $122,498.06 for the stock in BL. The value of BLM's assets had by now been reduced by further losses beyond the $109,000 reflected in the May 31 financial statement, and the purchase price paid for those assets therefore reflected a net worth reduced by total 1979 losses of over $300,000 through July. Also pursuant to the purchase agreements, and as a part of the closing, Colonial agreed in two Consultation and Non-Compete Agreements to pay Borough the sum of $600,000, representing the agreed premium above net worth, over a period of thirteen years. Colonial's obligations to pay this premium amount was personally guaranteed by Munday, Thomas and McComb.

From the outset, following the closing, Colonial had great financial difficulty in operating the dealership. A combination of factors, indisputable on the record, contributed in varying degrees to the difficulty. Interest rates and gasoline prices rose dramatically in 1979 and 1980. This contributed on a national basis to higher floor-plan costs and to a downturn in consumer interest in luxury cars such as Lincolns and even in mid-size cars such as Mercurys. In 1979 and 1980, the average number of automobile dealership failures was 25% higher nationally than was the average during the thirty-year period 1951–1981.

Specific problems beyond those generally affecting automobile dealerships, affected Colonial. Though Munday had committed to establish residency in Charlotte, he did not do so, coming there only intermittently. He employed a succession of sales managers in a short time, none of whom per-

formed acceptably to him. Both Musgrave and Myers, who had stayed on as presumably key employees of Colonial, left in dissatisfaction before the end of October 1979, and the office manager left in January 1980. Though Munday was under commitment to Ford Motor Company to provide additional capitalization of $1,000,000, he did not fully honor this commitment, though the exact amount of his default remained a disputed matter through trial.

Operational results, for whatever reasons, were disastrous. Most notably, Colonial sold only 387 new cars from the date of closing in August 1979 through December, 1979, and only 382 new cars in all of 1980, compared with BLM's sales of 1,375 in 1977 and 1,490 in 1978.

By mid-October of 1979, Munday was attempting to sell BL back to Borough. Borough declined, but helped arrange a purchase by a third party who paid Munday the same price $122,498.06, for which he had purchased the BL stock in August.

By January 1981, the Colonial dealership had essentially failed. The Ford franchise was formally terminated in early January. Liquidation of Colonial's assets was undertaken, culminating in an auction sale advertised for late January which was briefly held up by a subsequently dissolved attachment filed by Borough. Almost immediately thereafter, Colonial, Munday, Thomas and McCombs commenced this common law and statutory fraud action with the stated object of recouping the losses sustained in their purchase and subsequent operation of the BLM automobile dealership. Colonial stopped making payments on the deferred $600,000 element of the purchase price on June 1, 1981, indicating that it considered the obligation now avoided.

In their original complaints, the purchasers alleged a number of factual misrepresentations by Borough, Musgrave and Myers during the course of negotiations for the purchase. These included: an understatement of the number of BL lease customers in default; that a major account receivable was not in default; the omission to disclose a "substantial" number of "bogus sales" that were in reality leases not convertible to sales; that Musgrave and Myers would remain, presumably indefinitely, in Colonial's employment; and that Munday would have first refusal to purchase another business of Borough's. By a post-discovery amended complaint, they added to this list a misrepresentation respecting BLM profits for 1978 and 1979 by omitting to reflect bonuses paid Laney in the profit and loss section of the Ford financial statements. The purchasers sought as relief for the alleged misrepresentations rescission of the deferred payment agreements and return of all payments made under them; compensatory damages for their operating losses allegedly caused by their reliance upon the misrepresentations, losses estimated minimally at $900,000; punitive damages of $1,000,000; and compensatory damages for alleged violation of constitutional and civil rights in connection with the subsequently dissolved Borough attachment.[1]

---

**1.** Whether by inadvertence or confused and untenable design, the plaintiff-purchasers in their final pleadings sought to have it both ways in seeking or not seeking rescission of the underlying purchase and "consultation" agreements respectively. Originally they had sought rescission of both, along with compensatory, restitutionary, and punitive monetary relief. Later, by amended complaint, they expressly abandoned their prayer for rescission of the underlying purchase agreements, and thereafter sought rescission only of the "consultation agreements" for deferred payments of the "premium" portion of the purchase price, along with the various items of monetary relief originally sought.

The potentially difficult questions thereby raised of their entitlement to "affirm" one element while "disaffirming" another interdependent element of a unitary set of agreements allegedly tainted alike and in whole by the same fraud, of their entitlement in any event to the total range of cumulative remedies sought, and of their own obligation of restoration incident to any rescission granted, are of course now mooted by the determination of defendants' non-liability that we affirm. *See generally* D. Dobbs, *Handbook on the Law of Remedies,* §§ 9.2, 9.4 (1973).

We take note of this shifting, grab-bag remedial approach only to observe that it is of a piece with plaintiffs' grab-bag substantive approach in making and then abandoning facially serious claims of late-discovered, specific instances of fraud. In conjunction, these give added color to

Defendants counterclaimed, principally alleging breaches and anticipatory repudiation by Colonial of the obligation to make deferred payments under the purchase and related consultation agreements and of an assumed liability of BLM's on a computer lease for which BLM remained primarily liable. They sought recovery of damages against Colonial for those breaches and against the individual defendants as guarantors of the breached obligations, and the recovery of attorney fees as provided in the guaranties.[2]

Plaintiffs then pleaded, inter alia, in defense against the counterclaim, that the contracts sued upon were voidable by reason of the fraud alleged in their complaint. And on the issues so joined the case went to jury trial.

At the end of the trial, the district judge denied motions for directed verdict and submitted plaintiffs' common law and statutory securities fraud claims to the jury. In a ruling whose later consequences are now challenged on appeal, he declined to submit the defendants' counterclaim to the jury, reserving decision on that for subsequent determination "as a matter of law."

Despite the breadth of plaintiffs' original allegations of fraudulent misrepresentations by defendants, the court, without objection by plaintiffs, only submitted to the jury a limited few of those originally alleged. These had to do with the accuracy of the Ford financial statements, particularly with their omission of bonuses paid Laney in their profit and loss sections; with the failure to disclose the earlier existence and later discontinuance of a promotional leasing program; with the failure to reveal that a substantial account receivable listed as current in the Ford financial state-

ment was in fact not current but was covered by a promissory note; and with the intentions of Musgrave and Myers to remain in Colonial's employ.

Answering a set of special issues respecting these alleged misrepresentations, the jury returned a verdict finding in plaintiffs' favor on all but that having to do with Musgrave's and Myers's intentions to remain in Colonial's employ. Based on these special findings, the jury awarded damages totalling $555,000 against BLM and the individual defendants. On motions by defendants for judgment n.o.v. and, conditionally, for new trial under Fed.R.Civ.P. 50(c), the district court granted both, holding in detail that the evidence was insufficient to support a finding of liability in respect of any of the misrepresentations found, and that, in any event, the verdict as to each was against the weight of the evidence requiring, conditionally, a new trial.

Following up on its stated intention to determine the defendants' counterclaim as a matter of law, the court then conducted an evidentiary hearing at which, over plaintiffs' objection, defendants were permitted to introduce evidence respecting the discounted present value of the deferred payments yet owing by plaintiffs under the purchase agreements and evidence of the value of a computer whose lease Colonial had assumed. Following this hearing, the court entered judgment for defendants awarding damages for anticipatory repudiation by Colonial of the deferred payment agreement, breach of Colonial's obligation on the assumed liability for the computer lease, and attorneys fees pursuant to the individual plaintiffs' guarantees, in the total amount of $509,560.30.

This appeal followed.

the general impression that emerges from our evidence-sufficiency review of a questionable effort to retrieve by litigation based upon insubstantial factual claims and post-hoc legal constructs an improvidently entered and conducted business transaction. Certain it is that this approach—whatever its reason—has contributed to the burdensome and unduly complicated nature of this litigation, and to the difficulty of fairly resolving it.

2. There were other counterclaims by various ones of the defendants. All were washed out over the course of litigation except for those identified in the body of the opinion. By virtue of assignments and the dissolution of BLM and distribution of its assets to Borough as sole stockholder, the counterclaims above identified were finally those of Borough and were so adjudicated.

## II

We have carefully reviewed the extensive, probably unduly overblown, evidence in this case, and are satisfied that the district judge committed no error, indeed was eminently correct, in granting judgment n.o.v. to defendants on plaintiff's common law and statutory fraud claims. The district court's painstaking, comprehensive analysis of the evidence incident to this ruling requires no supplementation nor elaboration to justify it; we think it sound in all its essentials and affirm it as made. We comment briefly upon its most salient points only because the rejection of a jury's verdict—particularly one of this dollar magnitude rendered following a trial of this depth—is always and inevitably a matter of some concern in the administration of civil jury trials.[3]

First off, the sufficiency of the evidence to withstand the motion for judgment n.o.v. was demonstrably assessed under the appropriate federal standard of sufficiency as traditionally formulated in such cases as *Brady v. Southern Railway Co.*, 320 U.S. 476, 480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943) and *Ralston Purina Co. v. Edmonds*, 241 F.2d 164, 165 (4th Cir.1957) (rejecting "mere scintilla" standard); and

under the traditional substantive elements of the common law tort of fraudulent misrepresentation—directly as to the common law fraud claim and by appropriate transposition to the critical elements of the statutory securities fraud claim under § 10(b). Those substantive elements, as defined by North Carolina common law, are a specific misrepresentation or omission, materially false, made by one who knew of or was recklessly indifferent to its falsity, with an intention to deceive which was then reasonably relied upon by, and with resulting injury to, the person intended to be deceived. *See, e.g., Johnson v. Owen*, 263 N.C. 754, 140 S.E.2d 311, 313 (1965). We of course apply the same procedural and substantive standards in review. 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2524 (1971).

The only challenges to the grant of judgment n.o.v. are to the district court's rulings that the evidence was insufficient to support findings of fraudulent misrepresentation with respect to three of the greater number originally charged: (1) concealment of the Laney bonuses, hence overstatement of recent BLM profits; (2) concealment of the existence and nature of a

**3.** While the standards for directed verdict and judgment n.o.v. (directed verdict on reserved ruling) are identical, so that, in technical contemplation, the one involves no more an intrusion on jury prerogative than the other, the latter is obviously more likely to be perceived as an intrusion by any conscientious jury whose verdict is set aside. For this reason, though trial judges are formally encouraged for cogent reasons of judicial economy ordinarily to submit all but the plainest cases for jury verdict subject to the reserved ruling, *see generally* 9 C. Wright and A. Miller, *Federal Practice & Procedure: Civil* § 2533, p. 586 (1971), this always carries the risk of having then to reject a conscientiously reached verdict for reasons that will not ordinarily be explicable to the jury. Such a jury may, in consequence, understandably believe that the system has, in effect, merely employed it as a foil, or has actually rejected its product for lack of confidence in its intellectual or ethical integrity. While this risk and its consequences should not be overestimated, neither can they be ignored. To the extent the necessity for rejection can be avoided by instructions which, within permissible bounds, give helpful guidance to the "proper" verdict by

fair judicial comment upon the evidence, both its credibility and its probative force, the risk may helpfully and properly be minimized.

A minimally sufficient bare-bones instruction essentially confined to statement of the controlling black-letter substantive law and making no reference to the evidence will not likely minimize this risk. In a case where substantial monetary claims are involved, such instructions may indeed heighten the risk, given a jury's normal impulse to suppose that the very submission of such a claim without comment on the evidence must imply some judicial assessment of probable merit.

The instructions in this case, the resulting jury verdict, and the follow-up necessity of that verdict's rejection which we now affirm, may be an object lesson on this point. While there are ultimately countervailing risks of impermissible comment, the limits of latitude were not distantly approached by the bare-bones instructions on the law given in this case. Perhaps significantly, the district judge, prefatory to his grant of judgment n.o.v., opined for the record that the jury here had "been confused by the evidence or [had] misconstrued completely the court's instructions as to the applicable law."

promotional leasing program; and (3) concealment of the noncurrent status of a major account receivable. We address these in order.

(1)

*The "Laney bonus" misrepresentation.*

■ This alleged misrepresentation, asserted to have been turned up by plaintiffs only in the course of pre-trial discovery, came about as follows. The internally prepared 1977 and 1978 Ford financial statements that were provided by Borough representatives for Munday's inspection at his original meeting with Laney and then for the later negotiating sessions in June 1979, did not reflect in their profit and loss sections the fact that bonuses of $64,000 in 1977 and of $47,000 in 1978, a total of $111,000, had been paid to Laney, then the sales manager. These bonuses were however accurately reflected in those statements as distributions of retained earnings that reduced net worth by those precise amounts. Outside audited statements for the same years did reflect the bonus payments in their profit and loss sections, but these audited statements only came to the Munday group's attention when they were produced during pre-trial discovery in this action. The result of this discrepancy in accounting procedures was that the Ford financial statements reflected an income line item that was higher by $64,000 for 1977 and by $47,000 for 1978, than was reflected in the comparable profit and loss line item for the same years in the outside audited statement.

Plaintiffs claim that this constituted a fraudulent misrepresentation of the recent profit performance of BLM that was intended to deceive them and that in fact did so by inducing them in reasonable reliance upon it to buy what they would not otherwise have bought, with consequent loss.

The district court concluded that the evidence properly assessed in plaintiffs' favor

on this claim was insufficient to support jury findings with respect to the materiality of the statement, or that it was fraudulently made, or that plaintiffs reasonably relied upon it to their resulting injury. While we agree with the whole of this assessment, it suffices to point up only the most critical respects in which the evidence failed to support the requisite inferences.

In the first place, the critical point—that the bonuses had been paid—was not actually concealed by these statements. It was reflected in their net worth sections, sections as readily available for the plaintiffs' inspection as were the profit and loss sections. No direct discussions of the payment of bonuses occurred. Reasonable reliance can only be found where a person has made reasonable inquiry. *See Johnson v. Owens,* 263 N.C. 754, 140 S.E.2d 311, 313 (1965). To the extent therefore that Munday, a manifestly experienced businessman, failed to learn of the payment of these bonuses simply by failing fully to peruse the statements upon which he claims to have staked his reliance, that reliance could not rationally be found reasonable.[4]

Another aspect of the evidence further demonstrates the lack of rational basis for the necessary inferences. The patent incapacity of the statements to conceal the payment of bonuses from anyone who cared to give them even reasonably careful study undercuts any rational inference of the requisite fraudulent intent on defendants' part that they should have that effect. So inept an artifice is not logically compatible with the leap of inference required to find a deliberate, intelligent design to hoodwink an entrepreneur of Munday's known background and experience. It simply defies rational belief that Munday was or could have been assumed by these defendants to be so easy a mark for so amateurish a concealment; and no factfinder could rationally so find.

**4.** A further basis for concluding that reliance, certainly reasonable reliance, could not rationally be inferred was properly noted by the district court. To the extent any profit line item was misrepresented by overstatement in the

Ford financial statements, it would only have been the item "profit before taxes" (i.e., after extraordinary items), and not the more critical item "operating profit" as an indication of normal profitability.

Finally, there is the telling point—going both to the rationality of inferring either materiality or reasonable reliance—that Munday was not deterred from purchase at the originally discussed price by the open revelation by defendants just before the deal was struck, that BLM had lost $109,-000 in the five-month period just ended. As the district judge shrewdly observed, it defies rational belief that persons willing to invest upwards of $1,000,000 in a business notwithstanding that revelation would, however, still not have purchased but for an assumption that income for an earlier two year period was $110,000 greater than the actual figure.

We agree with the appellees that the requisites of fraudulent misrepresentation could only have been found here "by outright conjecture and not by any rational assessment of probabilities," *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 243–44 (4th Cir.1982), and that a finding to that effect was properly set aside as not sufficiently supported by the evidence.

(2)

*The "bogus sale"/promotional lease program.*

■ In their original complaint, plaintiffs made vague allegations respecting Borough's concealment during contract negotiations of the existence of a program of "bogus sales" of actually leased automobiles which allegedly injured the purchasers in a variety of ways: creating a "bad image," threatening the business with litigation, etc. Over the progress of the litigation this claim became transmuted into a scarcely less vague claim that the program had been a profitable one whose earlier discontinuance was fraudulently concealed by defendants, thereby inflating in plaintiffs' minds the apparent profitability of the general leasing operation of which it was a special feature. As it turned out, the program was a fairly simple one that involved leases of automobiles to people who could not immediately finance purchases but for whom financing allowing purchase might later be arranged. The "bogus sale" aspect originally alleged simply involved the taking of a deposit against potential purchase price that was treated as such in the seller's financial statement. In its final stages it involved only ten automobiles out of over 200 under straight lease.

This fraud claim in its final form was therefore that purchasers had been induced to rely upon a false picture, intentionally painted, of a profitable operation no longer in existence. We agree with the district court's assessment that the evidence was insufficient to support a finding of several of the essential elements of fraud. Initially, we observe that a scheme of fraudulent concealment so nebulous and shifting in plaintiffs' own evolving formulations might well not have satisfied the threshold requirement that to be actionable a misrepresentation must be specific. Beyond that, the evidence simply would not support rational findings of fact that defendants fraudulently concealed the existence and discontinuance of this promotional plan to induce reliance upon a false picture of profitability, nor that Munday, as an experienced businessman, could reasonably have relied in deciding to purchase upon so tenuous a "negative misrepresentation." That no one on seller's side volunteered any information about the plan and its discontinuance is conceded. Presumably many other facets of earlier operational history were not volunteered, as they typically will not be in any transaction of this type. But there was no evidence of deliberate concealment of the fact by outright falsehood, or by obfuscation in response to inquiry, or by anything of the sort. The undisputed evidence was, in fact, that sellers made available to purchasers every item of information requested, so that to the extent purchasers truly relied upon the tortured inference of concealed discontinuance of formerly profitable operations they assert, their reliance could not rationally be found a reasonable one in this transaction between experienced businessmen.

(3)

*The noncurrent account receivable.*

■ On both the 1978 BL Ford financial statement and on the list of BL's accounts

receivable given to Munday at closing, the $30,000 debt of a major rental customer was shown as a current account receivable. In fact the debt had by then been converted to and was evidenced by a promissory note in the same amount.

Plaintiffs' claim of material misrepresentation here was that the debt so misrepresented, though not actually concealed, misled them as to the state of BL's "good and current business" and that had they known the true nature of this debt they would not have purchased the two entities.

The flimsiness of this claim and of the evidence upon it is manifest on a number of equally cogent grounds relied upon by the district court in setting aside the jury's verdict upon it. Perhaps most telling is the lack of any rational basis for finding fraudulent concealment by defendants. The financial statement carrying this item (technically erroneously) as an account receivable rather than as a note was prepared long before these purchase negotiations commenced and obviously with no intent at that time to mislead plaintiffs by this means. As with the undisclosed bonus claim, this claimed artifice was in any event so manifestly inept a means for effectively misleading anyone with half an eye to his interests that it could not rationally have been ascribed to these sellers as a deliberate scheme to defraud in the respect claimed. Here, as in the matter of the "concealed" bonus, the net worth of the enterprises was not misrepresented by this accounting error (if such it can be called). That these plaintiffs, experienced businessmen all, were actually induced to make a $1,000,000 purchase by the misrepresentation of a $30,000 item as a current account rather than a promissory note defies rational inference; that any reliance they placed upon the "misrepresentation" was reasonable even more defies rational acceptance.

## III

Rightly perceiving that the jury's determination of the fraud issue on plaintiffs' claims would be determinative of liability on both the plaintiffs' claims and the defendant Borough's counterclaims, the district court concluded not to submit the counterclaims to the jury for separate consideration along with plaintiffs' claims. From that basically sound perception confusion, however, ensued. When the district court requested reactions to this proposed course during colloquy with counsel preceding jury arguments, counsels' responses—or non-responses—were ambivalent. The defendants' counsel opined that this was a sound procedure—that there were no factual issues on the counterclaims. The plaintiffs' counsel, for whatever reason, said nothing. On this state of affairs, the court submitted only plaintiffs' fraud claims, specifically instructing the jury that the counterclaim issues were being reserved for decision by the court.

Faithful to this declared course, and following grant of judgment n.o.v. for defendants on plaintiffs' fraud claims, the court set a hearing to decide, as a matter of law, the Borough counterclaims. At this point both sets of counsel revealed second thoughts about their earlier reactions to the court's proposed procedure. Though plaintiffs' counsel had made no formal objection at that time, they now stood both on their right to jury trial on any remaining factual issues, and on their entitlement to rely on the fact that no further evidence would be received by the court.

Defendants' counsel, on the other hand, now sought relief from their earlier apparent acquiescence in closing the evidence supporting Borough's counterclaims. Aware now that they might need to present evidence on two factual issues respecting the damages sought on the counterclaims, they sought to have the record reopened for that limited purpose. But also perceiving the shakiness of any contention that as to those issues plaintiffs had waived their original jury demand, defendants' counsel conceded that jury trial might be warranted and acquiesced in following that course if the court were so minded.

In response, the district court then concluded (1) to allow defendants to offer additional evidence to support the counterclaim

for damages in the two respects identified; and (2) then to determine the counterclaims, both as to liability and damages, without intervention of a jury. The court then conducted an evidentiary hearing at which evidence was received respecting (1) the discounted present value of Borough's right to receive future payments under the "consultation and employment agreements" designed to provide payment of the $600,000 "blue sky" premium element of the overall purchase price, and (2) the fair market value of a computer which was the subject of a lease assumed by Colonial as part of the purchase of assets transaction, then defaulted by Colonial, and paid by Borough under a personal guaranty to the lessor.

Following the evidentiary hearing the court determined as a matter of law that because fraud had not voided the contract of purchase, Borough was entitled to recover damages for breach and anticipatory repudiation of the deferred purchase price payment obligation, damages for breach of Colonial's assumed obligation under the computer lease, and attorney fees as provided in a guaranty by the individual plaintiffs. Judgment on the counterclaims was entered accordingly.

Plaintiffs now assign several errors respecting the court's disposition of the counterclaims. These are: (1) the court's reopening of the record to receive further evidence; (2) the denial of jury trial in respect of the two factual issues going to damages; (3) the court's ruling that defendant was entitled to recover the present value of future installments under the repudiated deferred purchase payments; (4) the court's ruling that attorneys fees were properly recoverable under the individual plaintiffs' guaranty of the deferred purchase obligation of Colonial; and (5) the

court's factual determination that the computer had a value of only $1,000 to be offset against the amount recoverable by defendant for Colonial's default under the assumed lease.[5] Plaintiffs also of course renew their challenge in this context to the court's setting aside of the jury's finding of fraud pleaded as a defense to Borough's counterclaims.

A

■ As earlier indicated, the court did not err in setting aside the jury's finding of fraud and granting judgment n.o.v. on that issue to defendants. This ruling therefore correctly rejected as well plaintiffs' defense of fraud in respect of Borough's counterclaim. The district court accordingly correctly held that, as a matter of law, plaintiffs were liable on the counterclaims.

■ The court also correctly ruled as a matter of law that plaintiffs were liable for anticipatory breach of the deferred purchase price agreements in an amount reflecting the discounted present value of the total balance unpaid at the date of anticipatory breach.[6] The court properly applied the state rule governing recovery for anticipatory breach of a bilateral executory contract under which the entire remaining obligation discounted to present value measures damages. *See Cook v. Lawson,* 3 N.C.App. 104, 164 S.E.2d 29 (1968); *see generally Williston on Contracts* § 1326 (3d ed. 1968); *cf. Roberts Co. v. Aladdin Knit Mills, Inc.,* 8 N.C.App. 612, 175 S.E.2d 289 (1970) (no right to recover future installments upon anticipatory breach of unilateral contract fully performed by injured party).

The court did not err in ruling that the individual plaintiffs were generally liable under their guaranty of Colonial's obliga-

---

5. This determination was made incident to the court's conclusion, not challenged by Borough on this appeal, that the computer lease was in legal contemplation a security instrument; that accordingly, under North Carolina's version of Article 9 of the U.C.C., plaintiffs were entitled to have credited against any amounts by which they were found in default under the lease the fair market vlaue of the computer which had

been disposed of by Borough without observing prescribed U.C.C. procedures.

6. In addition to the total owed on several installments already past due on the date of anticipatory repudiation of any obligation to pay future installments.

tions. These plaintiffs' apparent contention that they were wholly relieved of liability by reason of defendants' fraudulent misrepresentation of course falls with the court's proper rejection of the fraud defense to the counterclaims for breach of contract. More specifically, the court did not err in holding these plaintiffs liable for attorneys fees under a provision therefor in the guaranty. In doing so, the district court properly applied state statutory and decisional law respecting the recoverability of contractually provided attorneys fees. *See* N.C.Gen.Stat. § 6–21.2 (1981) (obligation for attorney fees stated in "evidence of indebtedness" enforceable against obligor); *Stillwell Enterprises, Inc. v. Interstate Equipment Co.*, 300 N.C. 286, 266 S.E.2d 812 (1980) ("evidence of indebtedness" includes any written instrument which evidences an obligation to pay money). Neither did the court abuse its discretion in determining the amount of attorneys fees that were, per the guaranty's provision, "reasonable."

### B

■ Though we find no error in any of the respects above summarized, we conclude that the court did err in denying plaintiffs' right to jury trial in respect of two factual issues critical to the determination of counterclaim damages. These issues were, respectively, the present value of the deferred payments owing under the repudiated consultation agreements, and the fair market value of the computer upon its disposition by Borough following Colonial's default under the assumed lease.

On any fair reading of the record, plaintiffs cannot be held to have waived, as to these issues, their original demand for jury trial which ran to all factual issues in the case. *See* Fed.R.Civ.P. 39(a)(1). Accordingly, that portion of the judgment awarding damages on Borough's counterclaim must be vacated, and the case remanded for redetermination of the amount of damages properly recoverable as to the two affected items. In all other respects, the court's rulings with respect to the amount

of counterclaim damages recoverable are affirmed and need not be re-examined.

*AFFIRMED IN PART; VACATED AND REMANDED IN PART.*