**Dr. Jose T. SOLANO and Jose T.
Solano Children's Trust,
Plaintiffs,**

v.

**DELMED, INC., Amin S. Khoury, William F. Frado, Jr., Addison L. Everett, Lehman Brothers Kuhn Loeb Incorporated, Frederick Frank, Dominique G. Lahaussois, John Doe, Jane Doe, and John Doe, Inc., Defendants.**

Civ. A. No. 88–1752 SSH.

United States District Court,
District of Columbia.

Feb. 26, 1991.

Vanessa Ruiz, Geprge A. Lehner, Washington, D.C., for plaintiffs.

[Lehman Bros., Frank, Lahaussois] Daniel K. Mayers, Eric R. Markus, Andrew B. Weissman, Wilmer, Cutler & Pickering [Delmed, Khoury, Frado, and Everett], John H. Beisner, Mark D. Plevin, Stephen J. Harburg, Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on two separate motions to dismiss filed by defendants.[1] For the reasons set forth below, the Court concludes that the RICO four-year statute of limitations bars plaintiffs' claims and, accordingly, the complaint must be dismissed.

## BACKGROUND

In considering a motion to dismiss, the Court must accept as true the factual allegations of plaintiffs' complaint and any ambiguities are resolved in plaintiffs' favor. *See Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985). Accordingly, the following facts are taken from the complaint.

Plaintiffs, Dr. Jose T. Solano ("Solano") and the Jose T. Solano Children's Trust ("Children's Trust"), have brought this action to recover damages for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.[2] Dr. Solano is a nephrologist who created and, during the time period relevant to this case, owned most of the stock of the Mid–Atlantic Nephrology Center, Ltd. ("MANC"). MANC was created in 1973 for the purpose of delivering quality dialysis services to kidney patients. Plaintiff Children's Trust is an irrevocable trust for the benefit of Dr. Solano's children. The trust also owned shares of common stock of MANC during the relevant time period.

Defendants are the following: Delmed, Inc., a Massachusetts corporation; Amin S. Khoury, director, chairman and CEO of Delmed; William F. Frado, vice president and general counsel of Delmed; A.L. Everett, senior vice president, treasurer, and chief financial officer of Delmed; Lehman Brothers Kuhn Loeb Incorporated, a Maryland corporation; Frederick Frank, managing partner of Lehman Brothers; Domi-

---

1. Defendants Lehman Brothers Kuhn Loeb Incorporated, Frederick Frank, and Dominique G. Lahaussois have joined in filing one motion to dismiss. Defendants Delmed, Inc., Amin S. Khoury, William Frado, Jr., and Addison L. Everett have joined in filing a second motion to dismiss. Defendants John Doe, Jane Doe, and John Doe, Inc., are individuals and business organizations whose identities are presently unknown to the plaintiffs. Both motions to dismiss essentially are based on the same legal theories, although the facts relevant to each defendant's participation differ in some respects.

2. Plaintiffs have filed a total of four actions in three jurisdictions against these defendants, each arising from the same transactions. In addition to the above-captioned action, plaintiffs filed two actions in Massachusetts, one of which has been transferred to the undersigned (Civil Action No. 90–710), and one action in New York.

nique G. Lahaussois, a vice president of Lehman Brothers; and certain unidentified "John Doe Defendants."

Having previously identified MANC as a potential candidate for acquisition, in late spring of 1983 Delmed expressed an interest in "working together" with MANC and Solano. In response, Solano, by telephone, enlisted defendants Lehman Brothers and Frank to assist in the potential sale. In July 1983, Frank and Lehman Brothers recommended divestiture of MANC for a price of $10—13 million. On August 15, 1983, Lehman Brothers, through defendants Lahaussois and Frank, gave Solano and other MANC officers a presentation in which they stressed Delmed's financial strength. At that time, Frank recommended the sale of MANC to Delmed, and Solano instructed Frank to enter into negotiations for the sale.

On August 26, 1983, Solano signed an agreement engaging the services of Lehman Brothers and Frank for advice in connection with the sale. On the same day, the parties, represented by counsel, reached an agreement in principle to sell MANC to Delmed in a stock for stock transaction, with Frank again stressing the strong financial state of Delmed and recommending the sale. In the next three months, Solano had a number of telephone conversations with defendants Frank and Lahaussois at Lehman Brothers concerning the sale of MANC to Delmed. During those months, Solano also made and received a number of telephone calls to and from defendant Khoury. Khoury described Delmed's strengths, including its unique capability as a manufacturer of several intravenous as well as dialysis solutions, and its strategic plan to be a vertically integrated provider of dialysis and other parenteral products and services. Solano relied on Khoury's representations in making his ultimate decision to sell MANC.

Over the next four months, representatives of Delmed made numerous requests for information and documents from MANC. Lehman Brothers and Frank did not, however, request similar information from Delmed.

In September 1983, and unbeknownst to plaintiffs, Delmed was advised by the United States Health Care Financing Administration that (1) Delmed's "rebate offer" to hospitals for assignment of patient accounts to Delmed constituted kickbacks in violation of federal criminal law, and (2) Delmed was being challenged for grossly overcharging Medicare in New Jersey. Additionally, Delmed closed three manufacturing facilities, also without plaintiff's knowledge. Defendants never advised plaintiffs of these actions during contract negotiations or at closing.

On October 26, 1983, Solano, Children's Trust, MANC, and the MANC Retirement Trust Ltd., as sellers, and Delmed and Mid-Atlantic Acquisition, Inc., a new Maryland company created by Delmed for the purpose of the acquisition, as buyers, entered into an Acquisition Agreement. Under the terms of the Acquisition Agreement, Solano and Children's Trust were to transfer all of their shares in MANC to Delmed for a total acquisition price of $10 million. As consideration for the MANC stock, Delmed would transfer to Solano and Children's Trust such number of Delmed shares of common stock as would equal $10 million, calculated on the basis of the market value of Delmed shares. The Acquisition Agreement identified $9.875, the market price of Delmed shares on the Acquisition Agreement date, as the "Signing Price."

Although plaintiffs were to receive unregistered stock, the Acquisition Agreement gave them "piggyback" registration rights. It furthermore required Delmed to register such number of Delmed shares as would provide plaintiffs with profits of not less than $3 million, within one year of closing. The Acquisition Agreement also provided that Solano would enter into a two-year consulting agreement with Delmed and that he would continue to be involved in its activities.

In November 1983, defendant Frank told Solano that Delmed had asked Frank and Lehman Brothers to represent their interests in the potential sale of Delmed to a major company. Frank acknowledged that their representation of Delmed presented a

potential conflict, but urged Solano to consent to the representation, adding that such a sale would add value to plaintiffs' Delmed stock. Solano agreed to the representation.

On November 15, 1983, Delmed filed with the Securities and Exchange Commission (SEC) a Form 10–Q for the third quarter ending October 1, 1983. The report anticipated Food and Drug Administration (FDA) approval of Delmed's new production facility in Ogden, Utah, during 1984 and showed positive operating profit and net income. During November and December 1983, defendant Khoury represented to Solano that Delmed would soon be obtaining FDA licensing of its new production facility in Ogden, Utah, and that Delmed had become an attractive target for acquisition by a large company. Khoury represented to Solano that both of these events would increase the value of Delmed stock for all its shareholders.

The closing on the Acquisition Agreement was held on December 29, 1983, with buyer and seller represented by counsel. At that time, Delmed provided an officer's certificate, signed by defendant Everett as chief financial officer of Delmed, which purported to confirm that all representations and warranties were true as of closing, but stated that "as a result of the circumstances disclosed on Form 10–Q [for the fiscal quarter ending October 1, 1983], Delmed expects to experience a substantial loss from operations in the fourth quarter of fiscal 1983." However, the officer's certificate was located in the middle of voluminous closing documents, and was not brought to plaintiffs' attention. Moreover, none of the defendants gave any indication that Delmed was experiencing financial difficulties.

On January 16, 1984, defendant Lahaussois sent Solano a bill for Lehman Brothers' fee in the amount of $500,000.00. He congratulated Solano on the transaction, and told him that he and defendants Frank and Lehman Brothers would concentrate on enhancing the value of his Delmed stock.

In February 1984, Solano decided to exercise plaintiffs' right to register their Delmed shares. However, defendant Frado visited Solano in the District of Columbia to urge him not to register the stock. Frado reasoned that plaintiffs' registration and sale could lead to a price drop, which would be detrimental to all stockholders in relation to the ongoing negotiations to sell Delmed. Defendants Frank and Khoury also urged Solano not to register his stock.

On March 1, 1984, Delmed filed a Form 8–K with the SEC reporting an operating loss of approximately $3.5 million for the fourth quarter of 1983. On March 2, 1984, Solano signed a letter agreeing to defer registration of his shares. In return, Delmed agreed to register a sufficient number of shares of plaintiffs' Delmed stock to yield at least $3 million on June 30, 1984. In late April 1984, an article appeared in *Barron's* reporting that insiders at Delmed had made one purchase and 19 sales of the company's stock, selling shares worth half its net worth.

In May 1984, Solano received Delmed's 1983 Annual Report which showed a net operating loss for the fourth quarter of 1983, a net loss for the year, and a net loss per share. The Delmed losses would have been even higher had the report not accounted for the positive operating results of MANC and other companies which had been acquired by Delmed. The losses were attributed to Delmed's inability to sell its own dialysis products because of delay in obtaining FDA approval. However, Delmed stated in its Annual Report that it anticipated obtaining FDA approval by the middle of 1984 and commencing commercial production at the Ogden, Utah, plant soon thereafter.

Delmed filed its Form 10–Q for the first quarter of 1984 on May 15, 1984. That report again revealed net losses for the company and again in part attributed those losses to the inability to obtain FDA approval for the products to be manufactured at its Ogden, Utah, facility. Following the filing of the 10–Q, defendant Khoury called Solano and falsely assured him that Delmed was close to receiving FDA approv-

al. Furthermore, on June 30, 1984, Delmed failed to register a sufficient number of plaintiffs' shares to yield $3 million.

On August 1, 1984, Delmed sold MANC's clinics, along with other dialysis clinics previously owned by Metrolina, Inc. (which also had been purchased by Delmed in 1983), to National Medical Care, Inc., in an asset sale valued at over $7 million. The sale was reported in Delmed's 8–K filed with the SEC on August 15, 1984. On August 28, 1984, Delmed filed another 8–K with the SEC reporting that it had sold all of the assets of its telephone and mail order marketing business to MBLS II Corporation for over $10 million.

After these sales, Delmed's business shrunk dramatically as it became primarily a supplier of dialysis products, without its own clinics providing services to patients. Consequently, Delmed's stock continued to drop in value. By the time plaintiffs began selling their Delmed stock, the price was far below what defendants had represented to them at the time of acquisition. From 1984 to 1986, plaintiffs sold all of their shares of Delmed stock for a total price of $2,308,015.00, less than one quarter of the $10 million price on which the Acquisition Agreement was predicated and the closing consummated.

On March 20, 1985, defendant Lahaussois sent a letter to John Ferguson, Solano's investment advisor, who had disputed the $500,000.00 Lehman Brothers fee. In it, he offered to reduce the fee to $400,000.00 In responding, Ferguson did not offer to pay even the reduced fee. Defendants Lahaussois and Lehman Brothers never again tried to collect the fee.

On September 6, 1985, a payment schedule for certain debts Solano owed to Delmed and to the MANC Retirement Trust was proposed on behalf of Solano. On September 24, 1985, defendant Frado agreed to the plan. In addition, Frado offered Solano a new consulting contract and offered to return certain Solano payments in exchange for the release of all claims he might have against Delmed and its officers. Solano rejected the consulting agreement and refused to sign the release.

Plaintiffs claim that the course of conduct of defendant Delmed and of its defendant officers, consisting of fraudulent schemes to acquire and operate MANC, repeated itself in similar courses of conduct and fraudulent schemes perpetrated by Delmed and its officers in connection with Delmed's acquisition of the Serologicals Group in 1982 and Metrolina, Inc., in 1983.

The complaint alleges three counts, as follows:

COUNT I—Defendant Delmed committed mail fraud, wire fraud, and made material misrepresentations amounting to securities fraud, each of which is a "predicate act" constituting an instance of "racketeering activity," and all of which were interrelated and formed a "pattern of racketeering activity" in violation of RICO. Through the fraudulent schemes, Delmed acquired and controlled MANC and used its income to sell MANC in order to operate and subsidize Delmed's losses.

COUNT II—Through the pattern of racketeering, defendants Delmed, Khoury, Everett, Frado, Lehman Brothers, Frank, and the John Doe defendants conducted and participated directly and indirectly in the conduct of the affairs of MANC in violation of RICO.

COUNT III—Defendants Delmed, Khoury, Everett, Frado, Lehman Brothers, Frank, Lahaussois, and the John Doe defendants conspired to invest in MANC through a pattern of racketeering activity, to control and conduct the affairs of MANC, and to use the income derived from the racketeering scheme to operate Delmed, all in violation of RICO.[3]

---

3. Specifically, the complaint alleges that defendant Delmed violated 18 U.S.C. § 1962(a), (b), and (c), that defendants Khoury, Everett, Frado, Lehman Brothers, Frank, and Lahaussois violated 18 U.S.C. § 1962(c), and that all the defendants violated 18 U.S.C. § 1962(d). Under section 1962, a person commits a RICO violation

when he (a) invests income derived from a "pattern of racketeering activity" in an "enterprise"; or (b) controls an "enterprise" through a "pattern of racketeering activity"; or (c) participates in an "enterprise" through a "pattern of racketeering activity"; or (d) conspires to violate subsection (a), (b) or (c). See 18 U.S.C.

Plaintiffs are seeking to recover, against all defendants, jointly and severally, $10 million for actual and consequential damages, $25 million for injury to business and career prospects and contractual relations suffered, treble damages, and reasonable attorneys' fees. Plaintiff also seeks to recover $50 million in punitive and exemplary damages from defendants Delmed, Khoury, Frado, Everett, Lehman Brothers, Frank, and Lahaussois.[4]

## DISCUSSION

Defendants contend that plaintiffs failed to file their complaint within the four-year statute of limitations period applicable to civil RICO claims. *See Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Plaintiffs argue that their claims did not accrue until some time after June 27, 1984, the date four years prior to the filing of this action. They argue further that even if their claims did accrue prior to June 27, 1984, the defendants fraudulently concealed the RICO claims from plaintiffs, thereby tolling the statute of limitations until plaintiffs discovered their claims.

■ To support a RICO claim, a plaintiff must allege a "pattern," that is, at least two predicate acts, of "racketeering activity." 18 U.S.C.A. §§ 1961(5), 1962(a)–(c) (1990); *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Racketeering activity means indictable criminal conduct as defined in federal and state statutes. 18 U.S.C.A. § 1961(1). The statute of limitations for a plaintiff's RICO claims begins to run on the date that a plaintiff " 'discover[ed], or should have discovered through the exercise of reasonable diligence, the fraudulent activity in question.' " *Bender v. Rocky Mountain Drilling Associates*, 648 F.Supp. 330, 334 (D.D.C.1986) (quoting *Cross v. Price Waterhouse & Co.*, [1982–1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,153 at 95,568 (D.D.C.1983)); *see also Riddell v. Riddell Washington Corp.*, 680 F.Supp. 4, 7 (D.D.C.1987), *aff'd in part, rev'd in part*, 866 F.2d 1480 (D.C.Cir.1989).[5]

■ Defendants argue that the limitations period began to run at the time of plaintiffs' injury, that is, at the time of the sale of MANC to Delmed in December 1983, or, at the latest, during the months following the transaction up to and including May 1984. Information provided at closing indicated substantial losses for Delmed, and further information concerning Delmed's financial woes became a matter of public record by early 1984. Defendants further argue that the price of the Delmed stock had dropped by May 15, 1984, and thus, plaintiff had sustained inju-

---

§ 1962(a)-(d) (1988). An action to recover civil damages requires an additional element. Section 1964(c) provides that only a "person injured in his business or property by reason of a violation of section 1962" may bring a civil RICO action. Thus, a plaintiff must prove not only that the acts of a defendant constitute a RICO violation, but also that plaintiff suffered an injury as a result of that violation. *See Sperber v. Boesky*, 849 F.2d 60, 64 (2d Cir.1988).

4. Plaintiffs allege that this course of illegal conduct involved (i) representations by the defendants that Delmed was financially sound and well-managed, and that MANC would be integrated into Delmed and add value to Delmed stock, (ii) statements inducing plaintiffs in the Spring of 1984, through a series of misrepresentations, to defer registration and sale of their Delmed stock based on representations of even greater gains in Delmed stock, and (iii) conduct that led to a depletion in the value of Delmed stock by selling the assets of MANC and other Delmed assets to third parties in August 1984.

5. The Supreme Court in *Agency Holding* did not reach the question of when a civil RICO cause of action accrues. 483 U.S. at 156–57, 107 S.Ct. at 2767–68. While this court has adopted the "discovery rule" as the appropriate standard for accrual, our Court of Appeals has not yet affirmed its use. *See, e.g., Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C.Cir. 1989) ("... we need not reach ... the issue of whether the 'discovery rule' applies to RICO claims, ...") However, this rule has been adopted by several other Circuit Courts of Appeals. *See, e.g., Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274 (9th Cir.1988); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir.1987); *Bowling v. Founders Title Co.*, 773 F.2d 1175, 1178 (11th Cir.1985), *cert. denied, Zoldessy v. Founders Title Co.*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986); *Alexander v. Perkin Elmer Corp.*, 729 F.2d 576 (8th Cir.1984) (per curiam).

**853**

ry and had adequate notice of potential claims by May 1984.

Plaintiffs argue that they lacked knowledge of all the elements of the RICO cause of action, particularly the "pattern of racketeering activity" and "injury" requirements, until June 30, 1984, at the earliest, the date of the alleged first clear breach of defendant Delmed's obligation to plaintiffs. They furthermore argue that they did not begin to suspect a pattern of racketeering activity until August 1984 when MANC was sold to a third party. Plaintiffs contend that until there was evidence of the alleged pattern, the RICO claim had not accrued, even if the individual predicate acts making up certain elements of plaintiffs' claim occurred before that time. Plaintiffs also argue that defendants fradulently concealed facts that prevented plaintiffs from discovering the pattern of racketeering activity prior to June 27, 1984.

■ The Court agrees with defendants that, from the face of the complaint, there can be no doubt that plaintiffs had either actual or inquiry notice of defendants' alleged pattern of fraudulent activity prior to June 27, 1984. At the closing on December 29, 1983, after months of written and oral reassurances about the financial health of Delmed, defendants provided plaintiffs with an officer's certificate stating that Delmed expected to experience substantial losses in the fourth quarter of 1983. Plaintiffs allege that the certificate was buried in the middle of voluminous closing documents and that none of the defendants gave any indication that Delmed was experiencing financial woes. However, plaintiff Solano, then the CEO of MANC and represented by able counsel, had himself requested the officer's certificate. He was on the verge of closing a deal in which he would receive $10 million in unregistered stock in exchange for the company he created. As a matter of law, plaintiff, an intelligent professional and businessman who was represented by counsel, is charged with knowledge of the information contained in that certificate. *See Colonial Lincoln–Mercury, Inc. v. Musgrave,* 749 F.2d 1092, 1099 (4th Cir.1984); *Platsis v.*

*E.F. Hutton & Co., Inc.,* 642 F.Supp. 1277, 1292 (W.D.Mich.1986), *aff'd,* 829 F.2d 13 (6th Cir.1987), *cert. denied,* 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988).

In order to trigger the statute of limitations, however, "the plaintiff[s] must know facts giving notice of the particular cause of action at issue, not of just any cause of action." *Hobson v. Wilson,* 737 F.2d 1, 35 (D.C.Cir.1984), *cert. denied, Brennan v. Hobson,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Thus, the question is whether plaintiffs knew or should have known that they could file suit for alleged violations of the RICO statute prior to June 27, 1984. Accepting all allegations in the complaint as true, the Court must answer the question in the affirmative.

In paragraph 75 of the complaint, plaintiffs set forth several alleged violations of 18 U.S.C. § 1341, the mail fraud statute, and 18 U.S.C. § 1343, the wire fraud statute, and alleged incidents of fraud in the sale of securities by Delmed. In paragraph 76, plaintiffs state that each of the alleged violations and incidents is a "predicate act" and constitutes an instance of "racketeering activity" for purposes of civil RICO. In paragraph 77, plaintiffs go on to allege that these multiple acts of racketeering activity constituted a pattern of racketeering activity as defined in the RICO statute.

Thirteen of the 19 acts of racketeering alleged by plaintiffs and enumerated in paragraph 75 of the complaint occurred prior to June 27, 1984. Yet, plaintiffs in their opposition claim that the alleged pattern did not occur, or at least was not detectable by plaintiffs, until some time after June 27, 1984. They therefore conclude in their opposition that, absent this necessary element of a RICO cause of action, their RICO claim could not have accrued prior to June 27, 1984. It is evident from the face of the complaint, however, that plaintiffs considered the alleged 19 enumerated acts of racketeering to form a pattern that would support a RICO claim. Plaintiffs provide no reason why the pattern was clearly formed at act number 14, but not at act number 13.

Turning again to the complaint, it is evident that in the months between the closing and plaintiff's June 27, 1984, date, plaintiffs received overwhelming evidence that defendants had made misrepresentations and omitted material information. At the very least, the information plaintiffs received should have led them, through the exercise of due diligence, to make further inquiries. In early March, Delmed filed an 8–K report with the SEC which showed substantial losses for the last quarter of 1983. In May, Delmed filed its 1983 Annual Report and its report for the first quarter of 1984, both of which revealed significant losses.[6] These reports, combined with Delmed's pleas that plaintiffs withhold registering their shares, put plaintiffs on sufficient notice such that their cause of action accrued, at the latest, in late May 1984, more than four years before they filed this action.

■ Moreover, plaintiffs' argument that their claims could not have accrued until the stock was ripe for sale and actually sold is contrary to case law. In a securities fraud case, the injury occurs at the time the investor enters into a transaction relying on material misrepresentations, and the statute of limitations begins to run at the time the investor is placed on inquiry notice. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir.1987). "Defrauded securities purchasers are not permitted to delay bringing an action while avoidable damages accrue." *Id.* (citing *Stull v. Bayard*, 561 F.2d 429, 433 n. 4 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978)). In other words, an investor who has actual or inquiry notice that misrepresentations have been made may not sit on his cause of action, waiting to see the results of his investment. *Id.*

Although plaintiffs have filed this action under the RICO statute, with securities fraud claims constituting only some of the underlying predicate acts alleged, plaintiffs clearly are in the posture of being disgruntled investors alleging fraud. Thus, the

securities fraud cases and their underlying principles apply to plaintiffs. Plaintiffs' alleged injury occurred on December 29, 1983, at the time the deal for the acquisition of MANC by Delmed was closed. As stated above, plaintiffs faced a barrage of evidence that would indicate that defendants made material misrepresentations both in the course of the acquisition negotiations and thereafter. The statute of limitations then began to run when plaintiffs were placed on notice of the facts constituting their potential claims, certainly prior to June 1984.

■ It is true, however, that if defendants fraudulently concealed facts that prevented plaintiffs from discovering the alleged fraudulent activities, that fraudulent concealment would have tolled the statute of limitations. *See Hobson*, 737 F.2d at 33. Although plaintiffs did not directly raise the fraudulent concealment issue in their complaint, they do raise it in their opposition as a defense to defendants' statute of limitations argument. Moreover, plaintiffs do allege facts in the complaint which, if true, might constitute fraudulent concealment. The Court will therefore consider the argument.

A defendant who has engaged in fraudulent concealment "must show something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment." *Riddell*, 866 F.2d at 1491. The reason for the more stringent standard is that "[t]he fraudulent concealment by its nature makes discovery of the true facts more difficult, in part because it obscures the significance of such information as it comes to plaintiff[s'] attention." *Id.*

The Court concludes that plaintiffs had "something closer to actual notice" of their potential claims against these defendants. Surely they could have discovered the cause of action through the exercise of due diligence. *See id.* In fact, the Court would be hard pressed to think of a situa-

---

**6.** As noted, *Barron's* reported that Delmed insiders were selling their own shares of Delmed stock. While plaintiffs cannot be charged with

information printed in the news media, the report does illustrate the extent to which Delmed's financial woes had become public knowledge.

tion in which an investor could have received something closer to actual notice, short of defendants' submitting a written confession addressed to plaintiffs. Both the nature of the notice and the degree of notice received lead the Court to this conclusion. That is, plaintiffs received several reports, filed with the SEC as required by law, which indicated that the company was in a far different state financially than plaintiffs allege that defendants had indicated. On the face of the complaint, it is obvious: as plaintiffs allege the facts, defendants were lying either to plaintiffs or to the SEC, either scenario of which would place plaintiffs on notice that the defendants had made or were making misrepresentations, to the detriment of plaintiffs. Moreover, plaintiffs did not simply receive a few isolated clues. Rather, they were bombarded with information from the date of the closing in December 1983 through May 1984. While the information taken in isolation might not have placed plaintiffs on more than mere inquiry notice, surely the information taken together as a whole put these plaintiffs on something very close to actual notice.

Because it is clear from the face of the complaint that the four-year statute of limitations bars plaintiffs' RICO claims, the complaint cannot survive defendants' motions to dismiss. *See Doe v. Dept. of Justice*, 753 F.2d at 1116.