**Beulah JONES, et al., Plaintiffs,**

v.

**MERIDIAN TOWERS APARTMENTS, INC., et al., Defendants.**

**Civ. A. No. 90–2314 SSH.**

United States District Court, District of Columbia.

March 23, 1993.

Jeffrey Brian O'Toole, Michael R. Diamond, O'Toole, Rothwell, Nassau & Steinbach, Washington, DC, for plaintiffs.

F. Whitten Peters, Williams & Connolly, Washington, DC, for defendants.

OPINION

STANLEY S. HARRIS, District Judge.

Before the Court are defendants' motion for summary judgment on statute of limitations grounds, plaintiffs' motion for leave to amend and to supplement their opposition to defendants' summary judgment motion, defendants' motion to dismiss the amended complaint, defendants John D. Hagner's and William M. Harvey's motion to dismiss, and the oppositions and replies thereto.[1] Upon consideration of the entire record, the Court grants plaintiffs' motion to amend and to supplement their opposition and finds that a supplemental reply by defendants is unnecessary to resolve the motion for summary judgment.[2] The Court also denies defendants' motion for summary judgment, denies their motion to dismiss the amended complaint, and grants in part and denies in part the motion of defendants Hagner and Harvey to dismiss. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56," the Court nonetheless sets forth its analysis. Fed.R.Civ.P. 52(a).

*Background*

Plaintiffs bring this action alleging fraud, conspiracy to defraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, breach of contract, rescission, and tortious interference with contract.[3] These allegations stem from the conversion into condominiums of a building at 2112 New Hampshire Avenue, N.W., in Washington, D.C., ("the building"), in which plaintiffs were, and plaintiffs Foster and Lanning still are, tenants. Until 1980, the building was a 173–unit rental apartment building subject to the District of Columbia rent control laws. Defendants are Meridian Towers Apartments, Inc.

---

1. The Court regrets the long pendency of the present motions. This case was transferred to this Court in its present posture from the calendar of another judge.

2. The Court has also considered the supplemental authority filed October 22, 1991, by defendants, and the supplemental authority filed November 21, 1991, by plaintiffs.

3. Plaintiffs, in the order listed in the heading of the amended complaint, are Beulah Jones, Randy McFadden, Gerald Lanning, Ron Hampton, Carolyn Johnson, David Snipe, Phyllis Wolfe, Jacqueline E. Smith, Phyllis Bentley, Pearle Young, Musa Sesay, William E. Foster, and Carolyn and Dereje Agonafer. On November 26, 1991, plaintiffs' counsel filed a suggestion of death for plaintiff Beulah Jones.

("MTA"), the contract seller of the condominium units at issue here; Dreyfuss Brothers, Inc. ("Dreyfuss"), the managing agent for MTA and for the owners of units in the building; and several individuals. The individual defendants are Joseph R. Schuble, Sr., a shareholder, officer, and director of MTA and an employee of Dreyfuss; Richard M. Aronoff, a shareholder, officer, and director of MTA and, during the relevant times, a partner in the law firm of Aronoff, David, Harvey & Hagner and successor firms representing MTA ("the law firm"); Richard G. David, the managing general partner of Meridian David Associates ("MDA") and a partner in the law firm; Harvey, a partner in the law firm at the times relevant to the amended complaint; Hagner, a partner in the law firm at the times relevant to the amended complaint; and Stanley J. Wrobel, a partner in the law firm at the times relevant to the amended complaint.

Plaintiffs allege that, in or about 1979, defendants devised a plan to convert the building into condominiums in the hope of making significant profits by removing the building from the strictures of the District of Columbia rent control laws. To accomplish this, the amended complaint alleges, defendants induced the tenant-plaintiffs to agree to the conversion by promising them the chance to purchase their units and by entering into purchase agreements with plaintiffs on which defendants never intended to close. In addition, the amended complaint alleges that defendants fraudulently induced plaintiffs to relinquish their rights under the law and their agreements with defendants.

*Facts*

In the summer of 1979, the tenants of the building formed a tenants association, the Meridian Towers Tenants Association, Inc., ("Tenants Association"), to represent their interests in the building's conversion. The Tenants Association was the authorized representative of the tenants and all of the plaintiffs were members. *See* Am.Compl., ¶ 36. The Tenants Association solicited offers from a number of developers to join it in converting the building into a cooperative apartment building or a condominium. MTA sent a proposal to the Tenants Association on October 8, 1979. Pursuant to a contract dated November 26, 1979, and its amendments dated June 30, 1980, and July 2, 1980, (referred to collectively as "the 1979 contract"), MTA and the Tenants Association entered into an agreement regarding the building's conversion into condominiums. Under this agreement, each participating tenant (defined as referring "to all persons entitled to legal occupancy of a single Apartment Unit at the Property as of November 1, 1979") had "an exclusive right to purchase an Apartment Unit at the Property." Defs.' Statement of Undisputed Facts, Ex. 3, ¶¶ IB, IIIA. The 1979 contract also states that:

> The Tenants Association and each Participating Tenant, by execution of this Agreement, hereby consents to the conversion of the Property to a condominium . . . and the Tenants Association shall . . . submit to . . . District of Columbia public authorities . . . an affidavit stating that the Tenants Association, acting on behalf of its members . . . , has agreed to the conversion of the Property to a condominium.

Defs.' Statement of Undisputed Facts, Ex. 3, ¶ VIB.

On various dates in 1981 and 1982, plaintiffs entered into purchase agreements with defendant MTA regarding their respective condominium units. *See* Defs.' Statement of Undisputed Facts, Ex. 6. These agreements provide in part that:

> 7. *Delay of Closing on Unit.* In · the event that title is not closed hereunder within 12 months from date of acceptance hereof by Declarant [MTA] then either Purchaser or Declarant may cancel this Agreement by written notice to the other. If Purchaser or Declarant exercises such option, all sums paid hereunder by Purchaser, including interest earned on the Deposit, shall be returned to Purchaser, this Agreement shall terminate, and neither party shall have any further rights against or obligations to the other. In no such event will Declarant be liable to Purchaser for delays in the closing of title.

Defs.' Statement of Undisputed Facts, Ex. 6., ¶ 7.

In February 1982, an officer of the Tenants Association phoned defendant Schuble inquiring about an extension of the one-year purchase rights. *See* Defs.' Statement of Undisputed Facts, Ex. 14 (Letter from Joseph R. Schuble to Richard M. Aronoff, dated Feb. 12, 1992). In a letter to defendant Aronoff, defendant Schuble communicated this conversation and stated that he felt "we should generate whatever amendments are necessary to extend the purchase rights of those tenants who took the necessary steps to contract and qualify even though we have not gone to settlement." *Id.* On April 24, 1992, Steve Otero, sales manager for defendant Dreyfuss Brothers, sent two copies of an addendum to all the contract purchasers with a letter that explained how to execute the addendum and that stated "[t]his addendum extends the date of closing on your unit." *See* Defs.' Statement of Undisputed Facts, Ex. 16 (Letter from Steve Otero to 2112 Contract Purchasers, dated April 24, 1992). The addendum contained language that modified paragraph 7 above to add the following sentence after the first sentence:

> Declarant shall not be entitled to exercise the right of cancellation specified in the prior sentence until after Declarant has notified Purchaser that Declarant is prepared to close on the Unit, and has offered Purchaser an opportunity to close thereon in accordance with the terms of the Unit Purchase Agreement.

Defs.' Statement of Undisputed Facts, Ex. 17.

Only four plaintiffs executed and returned the addendum: Bentley, Hampton, Smith, and Young.

Subsequent to these purchase agreements, MTA entered into a purchase agreement with MDA, dated July 1, 1982, ("the MTA–MDA contract") that transferred to MDA 33 units in the building in exchange for a nonrecourse purchase money note in the amount of $2,186,000. *See* Defs.' Statement of Undisputed Facts, Ex. 7. This group of 33 units included the units on which plaintiffs had entered purchase agreements. Defendants concede, at least for the purposes of the summary judgment motion, that "none of them told the tenants about this sale." *See*

Defs.' Motion for Summary Judgment, at 6. The MTA–MDA contract provided in part that "the Deed will not be immediately recorded. Instead, the Deed will be retained by Declarant in escrow as security for the payment of the Purchase Money Note...." *Id.* at Ex. 7, addendum at 4. In addition, it also provided that:

> Certain of the Apartment Units comprising the Unit [the units sold under the MTA–MDA contract] are occupied by "Participating Tenants" or "Special Tenants" and are subject to the rental and occupancy rights of the Special Tenants and the purchase rights of the Participating Tenants in accordance with the provisions of the Tenant Agreement of November 26, 1979, as modified by the Modifications dated June 30, 1980. These Apartment Units are sold by Declarant and accepted by Purchaser subject to the rental, occupancy, and/or purchase rights of these Participating Tenants or Special Tenants.

*Id.* at Ex. 7, addendum at 6.

The purchase agreement also provides a mechanism, at least after January 1, 1984, by which MTA could repurchase units to sell to purchaser-tenants:

> If any Participating Tenant elects to purchase and qualifies to purchase any Apartment Unit (the "Optioned Apartment Unit"), then and in such event Purchaser [MDA] agrees to resell and reconvey to Declarant [MTA], and Declarant agrees to repurchase from Purchaser, the Optioned Apartment Unit, at a price equal to one hundred five percent (105%) of the purchase price paid by Purchaser for the Optioned Apartment Unit, provided that such repurchase may not occur prior to January 1, 1984. *Id.* at Ex. 7, addendum at 6.

Although MDA did not record the deed, it filed rent control registrations with the Rental Accommodation Office (RAO) for 33 units in 1983, 1986, and 1990. These registrations specifically identified by number the units that MDA had purchased. *See* Defs.' Statement of Undisputed Facts, Ex. A to Ex. 30. Also, according to the building manager, a business license reflecting MDA's ownership of 33 units has been posted on the building notice board since early 1983. *See* Defs.'

Statement of Undisputed Facts, Ex. 29 (Decl. of Polly R. Green), ¶ 3. The notices do not reflect which 33 units MDA owned. *See id.* at Ex. A, B to Ex. 29 (copies of licenses).

The notice board contains notices of all kinds that are of interest to tenants (*e.g.*, tenant buy and sell notices, management notices to tenants; notices of neighborhood events; notices of Tenants Association meetings). From 1979 to 1985, the building notice board ... was located in the basement of the building in a 6' × 16' space between two halls.... This relatively small area ... was heavily trafficked by building residents because it also contained the only soda machine in the building, the only cigarette machine in the building, and the only public telephone in the building.... In addition, the apartment building's only multi-machine laundromat is located about 50 feet down the hall.

*See id.* at ¶ 5.

In 1985 the notice board was moved to the first floor and placed next to the mailboxes and the secondary entrance to the building. *See id.* at ¶ 6. According to plaintiffs' affidavit, however, plaintiffs did not see these licenses. *See* Pls.' Affidavit, ¶ 6.

In addition, beginning in May 1981, contracts on other units were going to closing. By November 1982, at least all but four units had been sold to investors. *See* Pls.' Opposition to Motion for Summary Judgment, Ex. 2, ¶ 5 (Decl. of Karen L. Conant). Except for the 33 units sold to MDA and 30 units sold to 2112 Associates, the other units were sold to investors in blocks of four or less. *See id.* at ¶ 5, ¶ 7.[4] Most of these sales were reflected in the records at the RAO by November of 1982. *See id.* at ¶ 9. Plaintiffs claim that these investors did not record their ownership with the Recorder of Deeds, but defendants admit only to MDA's lack of recording. *Compare* Am. Compl., ¶ 47 *with* Answer to Am. Compl., ¶ 47. In any event, at least some plaintiffs had actual notice of at least the existence, if not the extent, of these

sales. By letter dated September 22, 1981, defendant Wrobel wrote Robert Kendrick, the President of the Tenants Association, to confirm that MTA would pay $1,000 into the replacement reserve of the Unit Owners Association "for each Apartment Unit sold and settled on to the public within six months following the opening of sales to the public." Defs.' Statement of Undisputed Facts, Ex. 12. The letter also noted that at the July 20, 1981, meeting of the Tenants Association, the Association was advised that public sales had begun on May 15, 1981. *Id.* at Ex. 12.

Furthermore, according to the deposition of plaintiff Carolyn Agonafer, she learned in the latter part of 1983 that investors had closed on some units. A tenant at a Tenants Association meeting wanted to know

why were some of the apartments were [sic] purchased and closed on when he could, when he or she, whoever that tenant was, and Mr. Ike Kendrick mentioned that the [Tenants Association] has nothing to do with so many apartments that were set aside for investors. I think for the public, investors, whatever, the phrase that he used.

Defs.' Statement of Undisputed Facts, Ex. 13, at 281, lines 19–22; at 282, lines 1–3; *see* Interrogatory Answer 46(i) from Carolyn and Dereje Agonafer.

No participating tenant ever closed on a unit in the building. Most of the plaintiffs believed that closing should have occurred at least by or in 1983 or within a "reasonable time" after the contract was entered. *See* Defs.' Reply In Support of Motion for Summary Judgment, Table 1 (plaintiffs' individual interrogatory responses to question concerning the date they were entitled to close). In their interrogatories, plaintiffs Carolyn Agonafer, Bentley, Foster, Hampton, McFadden, Smith, and Young state that closing should have occurred by July 1, 1982, and plaintiff Sesay states that closing should have occurred in 1983. *See id.;* Defs.' Statement of Undisputed Facts, ¶ 21. In May and June of

---

4. At the time, an owner of four or less rental units could apply and receive an exemption from the rent control laws. *See Feldman v. District of Columbia Rental Housing Comm'n,* 501 A.2d 781, 782 n. 1 (D.C.1985), *vacated,* 506 A.2d 1100 (D.C.1986) (en banc) (discussing The Rental Housing Act of 1977 and The Rental Housing Act of 1980); *see also* Defs.' Motion to Dismiss the Am. Compl., at 10–12.

1984, plaintiffs Agonafers and tenant Dorothy Evans hired an attorney to attempt to force closing on their respective units or to negotiate the sale of their purchase rights.

On December 7, 1982, plaintiff Hampton and other nonplaintiff tenants met with defendants Aronoff, Hampton, Schuble, and Wrobel. Hampton, who was representing the tenant-purchasers, inquired about when closing would occur. *See* Am. Compl., ¶ 83; Answer to Am. Compl., ¶ 83. According to plaintiffs, he was told by defendants that market conditions had to improve before closing could occur. *See* Am. Compl., ¶ 84. He was also told that no rent increases after June 30, 1982, would be credited to the purchase price. *See* Am: Compl., ¶ 84; Answer to Am. Compl., ¶ 84. According to plaintiffs, and conceded by defendants for the purposes of the summary judgment motion, he was not told that on July 1, 1992, MDA had purchased the units. *See* Am. Compl., ¶ 86. At the meeting, or soon thereafter, MTA offered to repurchase the tenants' purchase rights. *See* Am. Compl., ¶ 84; Answer to Am. Compl., ¶ 84.

On January 20, 1983, MTA offered to repurchase the purchase rights from the participating tenants. After several meetings of the Tenants Association to discuss the issue, the Tenants Association made a counteroffer pursuant to which.all tenants would sell their rights. *See* Defs.' Statement of Undisputed Facts, Ex. 21. On May 3, 1983, defendant Schuble wrote to at least plaintiffs Sesay and Lanning and, for the purposes of this motion, the Court assumes to all of the plaintiffs, offering to buy their purchase rights, contingent upon all of the tenant-purchasers' accepting the offer before June 10, 1983. *See* Defs.' Statement of Undisputed Facts, Ex. 21; *see* Am. Compl., ¶ 50. This letter did not disclose that MDA had already purchased the plaintiffs' units. *See id.*

Then, on July 27, 1983, defendant Schuble wrote a letter to plaintiffs Agonafer, Bentley, Foster, Hampton, Johnson, Jones, Lanning, McFadden, Sesay, Smith,. Snipe, Wolfe, and Young proposing a new repurchase agreement that was not contingent upon all purchasers' participation. *See* Defs.' Statement of Undisputed Facts, Ex. 22. This letter also did not disclose MDA's ownership. *See id.* Then, on October 23, 1987, defendant Schuble wrote plaintiffs Bentley, Foster, Jones, Lanning, McFadden, Sesay, Smith, Snipe, and Young making a "limited final offer" to repurchase their purchase rights. *See* Defs.' Statement of Undisputed Facts, Ex. 25. The letter stated that "an economically feasible sellout could not be attained" and that "the ownership has decided to indefinitely defer any plan to market the apartments to individual owner/occupants." *Id.* It also provided that the offered amount would decrease by 1/12 each month for a year until the payment for relinquishing the purchase rights would be zero (except for the return of the initial deposit plus interest). *See id.* The letter also informed plaintiffs that they had a right under District of Columbia law to remain in their units as long as they continued to meet the terms of their lease agreements. The letter did not disclose MDA's ownership of the units. *See id.* On December 11, 1987, defendant Schuble again wrote a letter to plaintiffs Bentley, Foster, Jones, Lanning, and McFadden reaffirming the previous offer. *See* Defs.' Statement of Undisputed Facts, Ex. 26. Over the course of these offers, between the years of 1984 and 1988, all of the plaintiffs except Foster and Lanning executed releases of their rights to purchase in exchange for sums ranging from $7,327.00 to $20,485.83.[5]

*Discussion*

*Motion for Summary Judgment*

Defendants move for summary judgment on the RICO and common law fraud and tort

---

5. Plaintiffs executed releases on the following dates for the amount indicated, which includes return of a $1,000 downpayment and interest thereon:

| Date | Plaintiff | Amount |
| --- | --- | --- |
| 8/5/84 | Agonafer | $11,622.42 |
| 12/18/86 | Hampton | $20,092.00 |
| 3/16/87 | Lawrence | $11,804.00 |
| 9/17/87 | Young(904) | $ 7,327.00 |
| 11/20/87 | Smith | $16,569.83 |
| 12/87 | Snipe | $19,839.00 |
| 12/9/87 | Young(905) | $20,029.83 |
| 12/23/87 | Sesay | $20,485.83 |
| 12/28/87 | McFadden | $18,964.00 |
| 12/30/87 | Bentley | $18,329.00 |
| 6/88 | Jones | $14,752.97 |
| unknown | Johnson | $ 9,229.17 |

*See* Defs.' Statement of Undisputed Facts, ¶ 19.

counts on the grounds of statute of limitations. If their motion is granted on the RICO counts, they move to dismiss the remaining counts for lack of subject matter jurisdiction. Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### Statute of Limitations

The statute of limitations period for civil RICO claims is four years. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The statute of limitations for the common law fraud and tortious interference claims is three years. *See* D.C.Code § 12–301(8). Plaintiffs filed this action on September 19, 1990. Thus, if plaintiffs' cause of action accrued prior to September 19, 1986, on the RICO claims or prior to September 19, 1987, on the fraud and tort claims, then the action is time-barred unless fraudulent concealment by defendants tolled the statute of limitations.

As this Court has previously held, "[t]he statute of limitations for a plaintiff's RICO claims begins to run on the date that a plaintiff ' " 'discover[ed], or should have discovered through the exercise of reasonable diligence, the fraudulent activity in question.' " ' " *Solano v. Delmed, Inc.*, 759 F.Supp. 847, 852 (D.D.C.1991) (quoting

Bender v. Rocky Mountain Drilling Assocs., 648 F.Supp. 330, 334 (D.D.C.1986) (quoting Cross v. Price Waterhouse & Co., [1982–1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,153 at 95.568 (D.D.C.1983)) (other citations omitted)).[6] Likewise, the discovery rule determines accrual of causes of action for common law fraud. *See Kropinski v. World Plan Executive Council—US*, 853 F.2d 948, 955 (D.C.Cir.1988) (citing *King v. Kitchen Magic, Inc.*, 391 A.2d 1184, 1186 (D.C.1978) (other citation omitted)). Therefore, the questions before the Court on defendants' motion are:

(1) whether a jury could reasonably find that plaintiff never had sufficient knowledge of the facts to set the statutes of limitations for his respective causes of action running in the first instance; if it could not so find, (2) whether it could reasonably conclude that those statutes of limitations were tolled, either from the outset or at some subsequent point, by affirmative acts of fraudulent concealment by the defendants; and, if the jury could reasonably conclude that the statutes were so tolled, (3) whether the jury would nonetheless be compelled to conclude that defendants met their burden of showing that plaintiff was on notice of his claims under the standard for notice that is applicable once fraudulent concealment is shown.

*Riddell*, 866 F.2d at 1490.

Upon consideration of these questions, the Court finds that there are genuine issues of material fact which preclude granting defendants' motion.

### Knowledge of the Cause of Action

■ "In order to trigger the statute of limitations ... a 'plaintiff must know facts giving notice of the particular cause of action at issue, not of just any cause of action.' " *Solano v. Delmed*, 759 F.Supp. at 853 (quoting *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984)). Under District of Columbia law, the elements are fraud are "(a) a false representation, (2) concerning a material fact, (3) made with knowledge of its falsity

---

6. The Court of Appeals for this Circuit has not yet reached the issue of whether the discovery rule is appropriate in RICO actions. *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C.Cir.1989) ("[W]e need not reach ... the issue of whether the 'discovery rule' applies to RICO claims....").

and the intent to deceive or made recklessly, either in disregard of its falsity or without positive knowledge of its truth, and (4) upon which reliance is placed." *High v. McLean Fin. Corp.*, 659 F.Supp. 1561, 1566 (D.D.C. 1987) (citing *Higgs v. Higgs*, 472 A.2d 875, 876 (D.C.1984) (other citations omitted)). The elements of a claim for tortious interference are "1) the existence of a legal contract; 2) defendant's knowledge of that contract; 3) intentional interference without justification; and 4) resulting damages." *Conservative Club of Washington v. Finkelstein*, 738 F.Supp. 6, 11 (D.D.C.1990) (citing *Dunn v. Cox*, 163 A.2d 609, 611 (D.C.1960) (other citations omitted)).

The Court finds that plaintiffs had sufficient knowledge to place them on at least inquiry notice of their common law claims prior to September 19, 1987. Plaintiffs knew, or could have discovered with reasonable diligence, that (1) they had entered into contracts to purchase in 1981 or 1982, (2) that it was more than four years later and they had not closed, (3) that investors had closed on units, and (4) that beginning in 1983 and continuing on and past 1986, defendants had made a concerted effort to acquire their purchase rights. The Court finds that these facts alone should have put them on at least inquiry notice of their common law fraud and tort claims and that no reasonable jury could find otherwise. Plaintiffs knew little more in 1989 when plaintiff Lanning went to the RAO and discovered that MDA owned plaintiffs' units, the fact that precipitated the filing of this suit. Given this finding, the Court must also find that plaintiffs had enough information to put them on at least inquiry notice of their RICO claim prior to September 19, 1986.

■ "To support a RICO claim, a plaintiff must allege a 'pattern,' that is, at least two predicate acts, of 'racketeering activity.'" *Solano*, 759 F.Supp. at 852 (citing 18 U.S.C.A. § 1961(5), 1962(a)–(c) (1990); *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 105

S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Racketeering activity includes mail and wire fraud. 18 U.S.C.A. § 1961(1)(B). Plaintiffs allege acts of mail and wire fraud, as set forth in part at paragraphs 90 and 102 of plaintiffs' amended complaint, as the basis for their RICO claims. *See* Am. Compl., ¶¶ 90, 102.

Seven of the thirteen letters listed in paragraph 90 were mailed prior to September 19, 1986. *See* Am. Compl., ¶ 90. The only two letters that were allegedly mailed to all of the plaintiffs were among these seven. These two letters were the offers to purchase plaintiffs' purchase rights mailed in May and July of 1983, respectively. Letters were also mailed in 1980 to all plaintiffs, allegedly as a part of a scheme to induce plaintiffs to pay "ever-increasing rent." *See* Am. Compl., ¶¶ 93–95. Additional letters were mailed each June or July from 1981–1988 to each plaintiff remaining in the building informing them of a rent increase. *See* Am. Compl., ¶ 96. None of these letters informed plaintiffs that MDA had purchased their units by contract dated July 1, 1982.

In addition, plaintiffs allege that defendants used the telephone to advance their fraudulent scheme. Of the conversations listed in paragraph 102 of the amended complaint, at least eight of them occurred before September 19, 1986. *See* Am. Compl., ¶ 102. In addition, "numerous" calls in June, July and August of 1984 were made by plaintiff Agonafer to defendant Wrobel. *See id.* Six telephone calls are alleged after that date. *See id.*

Therefore, a majority of the alleged racketeering acts occurred prior to September 19, 1986. The Court finds that plaintiffs had sufficient knowledge to put them on inquiry notice of a RICO cause of action prior to that date and that no reasonable jury could find otherwise.

### Fraudulent Concealment [7]

■ This does not end the inquiry. *See Riddell*, 866 F.2d at 1490–91 (stating that

---

7. As an initial matter, the Court rejects defendants' argument that plaintiffs have not asserted sufficiently particular allegations of fraudulent concealment to meet the requirements of Fed. R.Civ.P. 9(b). "Rule 9 is to be read in tandem

with the Rule 8 ... requirements of simplicity in drafting and flexibility in reviewing pleadings." *Fink v. National Savings and Trust Co.*, 772 F.2d 951, 959 (D.C.Cir.1985) (citing 5 Charles Wright

district court, upon finding that plaintiffs were on notice of claim, must also reach plaintiffs' "allegations of fraudulent concealment"). Under both local and federal law, fraudulent concealment by defendants tolls the statute of limitations. *See id.* at 1491 (citations omitted). Fraudulent concealment can occur in two ways: first, the wrong itself can be by its nature self-concealing or, second, defendants can take some active step to conceal the wrong. *See Hobson v. Wilson,* 737 F.2d 1, 33–34 & n. 102 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Unless the "concealment ha[s] been so effective that there was no reason for a diligent plaintiff to have entered into any inquiries as to a possible cause of action," the conflicting treatment of the two types by different circuits is "more apparent than real." *Hohri v. United States,* 782 F.2d 227, 248 n. 54 (D.C.Cir.1986), *reh'g denied,* 793 F.2d 304 (D.C.Cir.) (en banc), *and vacated on other grounds,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). "Under either approach, if the jury finds fraudulent concealment, defendants will have the burden, if the statute is not to be tolled, of proving that plaintiff[s] 'could have discovered ... the cause of action if [they] had exercised due diligence.' " *Riddell,* 866 F.2d at 1491 (citations omitted).

If a jury could find that defendants " 'lulled' the plaintiff[s] into inaction" or that the wrongs themselves were designed to be self-concealing, then the Court must leave the issue of defendants' statute of limitations defense to the jury. *See Kropinski,* 853 F.2d at 957. Although " 'mere silence' " does not amount to fraudulent concealment, " 'any statement, word or act which tends to suppress the truth raises the suppression to that level.' " *National R.R. Passenger Corp. v. Notter,* 677 F.Supp. 1, 6 (D.D.C.1987) (quoting *Jackson v. Combs,* 18 D.C. (7 Mackey)

& Arthur Miller, Federal Practice and Procedure § 1298, at 406 (1969)).

8. The Court, of course, is not finding these facts to be true but only finding that, based on the current record, a jury could reasonably find these facts, or others, to reach the reasonable conclusion that there was fraudulent concealment.

608 (1888)). Among the undisputed facts or material facts in dispute from which a jury could find fraudulent concealment are: (1) that defendants closed on investors' units while affirmatively representing to plaintiffs that closing was not feasible; (2) that defendants sold the units for which plaintiffs had purchase contracts in a manner that tended to hide such sales from plaintiffs (regardless of whether they were legally obligated to record such sales); (3) that defendants sold other units to investors in the same manner; (4) that defendants sold so many of the other units that the contractual requirements of plaintiffs' contracts could not have been fulfilled, yet plaintiffs were not so informed; and (5) that defendants' offers to buy plaintiffs' purchase rights were intentionally worded to disguise that MDA owned the units.[8] Therefore, the Court finds that there is sufficient evidence that a reasonable jury could find, depending on its resolution of disputed facts or the inferences to be drawn from the facts, that defendants fraudulently concealed information essential to plaintiffs' claims, either because the acts were self-concealing or by affirmative acts of concealment.

*Heightened Notice Standard*

Nevertheless, even though the Court has concluded that a reasonable jury could find fraudulent concealment, the Court must decide whether defendants have shown that plaintiffs were on sufficient notice of their claims despite the concealment such that no reasonable jury could find that the statute should be tolled. "Specifically, a defendant who has engaged in fraudulent concealment, in order to make out a defense based on the plaintiff's lack of due diligence, must show something closer to actual notice than the merest inquiry notice...." *Riddell,* 866 F.2d at 1491.[9] Although this heightened no-

9. Defendants argue that *Riddell*'s "closer to actual notice" standard applies only to affirmative acts of concealment and thus is not the proper standard by which to judge plaintiffs' due diligence under the facts of this case. *See Defs.'* Motion for Summary Judgment, at 19 n. 12. Even assuming that to be the law, as noted above, *Riddell* defines "affirmative act" broadly enough that a reasonable jury could find it encompasses the conduct of defendants here:

tice standard is not well-defined, based on the record before it, the Court believes that a reasonable jury, if it found fraudulent concealment, could find that plaintiffs were merely on inquiry notice of their RICO, fraud, and tortious interference claims. Therefore, the Court must deny defendants' motion for summary judgment on statute of limitations grounds and defer to the factfinder for resolution of that defense.[10]

*Motion to Dismiss the Amended Complaint*

Defendants also move to dismiss or, in the alternative, for summary judgment on, the amended complaint based on numerous other grounds, all of which the Court rejects, essentially for the reasons stated in plaintiffs' opposition. The Court finds further explanation unwarranted. *See* Fed.R.Civ.P. 52(a).

*Motion to Dismiss Defendants Hagner and Harvey*

Defendants Hagner and Harvey move for dismissal of, or for summary judgment on, the claims against them on several grounds. As to the first ground, as the Court has already found, the amended complaint is sufficient to satisfy the requirements of Rule 9(b). *See supra* n. 6. As to the second ground, the Court finds that there are genuine issues of material fact as to whether Hagner and Harvey participated in a conspiracy to defraud these plaintiffs. The Court agrees with defendants Hagner and Harvey as to their third ground and dismisses the § 1962(c) claim in Count Three as to them. However, because the Court finds that they could still be found liable under

§ 1962(d) as alleged in Count Four, the Court does not dismiss them from the action.

■ Count Three of the amended complaint alleges violations of substantive RICO § 1962(c). Count Three claims in part that Hagner and Harvey both purchased condominiums in the building, rented them for a profit above what could have been charged prior to the conversion, and did not record the deeds. In addition, it alleges that Harvey wrote a letter to at least both the Agonafers and Lanning as an agent for MTA proposing to buy their purchase rights.[11] These letters did not disclose that MDA already owned their units. It also claims that as legal counsel to MTA they received legal fees from a RICO enterprise. Count Four of the amended complaint further alleges that defendants Hagner and Harvey conspired with the other defendants in violation of § 1962(d).

The Court agrees with defendants that the allegations in Count Three are insufficient to meet the RICO participation requirement. *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."). As recently defined by the Supreme Court in *Reves v. Ernst & Young*, § 1962(c) requires that defendants have "*some* part in directing the enterprise's affairs." *Reves v. Ernst & Young*, —— U.S. ——, ——, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993) (emphasis in original).[12] In *Reves*, the Supreme Court

" '[a]ny statement, word or act which tends to suppress the truth raises the suppression to that level.' " *Riddell*, 866 F.2d at 1492 (quoting *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1191–92 (D.C.1980)).

10. In their reply, defendants also argue that even if plaintiffs survive summary judgment on the basis of fraudulent concealment as to some of the defendants, defendants Harvey, Hagner, and David should be granted summary judgment because plaintiffs have failed to allege adequately acts of fraudulent concealment on their part. The Court finds this argument without merit. Given that plaintiffs have alleged a conspiracy, the "affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute

of limitations." *Riddell*, 866 F.2d at 1493 (citations omitted). This tolling applies both to conspiracy counts and to underlying substantive offenses. *See id.* at 1494.

11. Defendant Harvey claims that discovery has revealed only the letter to the Agonafers. The Court does not find this issue to be determinative.

12. In so holding, the Supreme Court "disagreed with the suggestion of the Court of Appeals for the District of Columbia Circuit that § 1962(c) requires '*significant control* over or within an enterprise.' " *Id.* —— U.S. at —— n. 4, 113 S.Ct. at 1170 n. 4 (quoting *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639* ("*Yellow Bus III*"), 913 F.2d 948, 954 (D.C.Cir.

affirmed the Eighth Circuit's "operation or management test" for § 1962(c) liability, holding that "[i]n sum, . . . one must participate in the operation or management of the enterprise itself." *Id.* —— U.S. at ——, 113 S.Ct. at 1173.

Here, the facts alleged as to defendants Harvey and Hagner are insufficient to reach that level of participation. The fact that Harvey may have written one or two letters and therefore could be found by a jury to have committed at least one act of racketeering does not change the Court's conclusion. As noted in *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639 ("Yellow Bus III")*, the commission of predicate acts violates § 1962(c) "only when those acts were the vehicle through which a defendant 'conduct[ed] or participat[ed] . . . in the conduct of [the] enterprise's affairs.'" *Yellow Bus III*, 913 F.2d 948, 954–55 (D.C.Cir. 1990) (en banc) (citing 18 U.S.C. § 1962(c)) (alterations in original), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). Therefore, the Court dismisses Count Three as to defendants Hagner and Harvey.[13]

■ This holding, however, does not absolve defendants Hagner and Harvey of all potential RICO liability. They are also charged in Count Four with conspiracy to violate RICO under § 1962(d). *See* 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.") Section 1962(d) is not a substantive RICO offense. "Subsection (d) adds nothing substantive to the law. Rather, it makes it unlawful to conspire to violate any of the preceding three sections." *Danielsen v. Burnside–Ott Aviation training Center,*

941 F.2d 1220, 1224 (D.C.Cir.1991) (citing 18 U.S.C. § 1962(d)).

RICO is interpreted "against the backdrop of general conspiracy law. . . ." *United States v. Carter,* 721 F.2d 1514, 1529 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). Under traditional conspiracy law, it is not necessary that an alleged coconspirator actually commit the underlying substantive offense or even be capable of committing the substantive offense. *See Gebardi v. United States,* 287 U.S. 112, 121, 53 S.Ct. 35, 37, 77 L.Ed. 206 (1932) ("Incapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others who are able to commit it."); *United States v. Rabinowich,* 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915). Requiring that plaintiffs show that all of the alleged coconspirators conducted or participated in the conduct of the affairs of a racketeering enterprise to the extent required for § 1962(c) would require "a degree of involvement in the affairs of the conspiracy that is not required in any other type of conspiracy, where agreeing to a prescribed objective is sufficient." *United States v. Neapolitan,* 791 F.2d 489, 498 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986).

Nothing in *Reves, Yellow Bus III,* or *Danielsen* requires that claims under § 1962(d) allege management or operation of the enterprise by all of the alleged coconspirators. This Circuit has not yet addressed to what extent alleged coconspirators must be involved in the underlying substantive offense to be held liable under § 1962(d). Thus, the Court must look to other circuits for guidance. A majority of the circuits have held that a violation of § 1962(d) occurs when a

---

1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991)) (emphasis added by Supreme Court). This Court interprets the disagreement to be one merely of the degree of control required. *See id.* —— U.S. at ——, 113 S.Ct. at 1168–70 (noting that *Yellow Bus III* had "adopted an 'operation or management' test"). The remainder of the sentence from *Yellow Bus III* quoted in *Reves* states that mere participation in the affairs of the enterprise is not enough for liability, but that conduct of the affairs is required. *See Yellow Bus III,* 913 F.2d at 954; *see also Danielsen v. Burnside–Ott Aviation Training Center,* 941 F.2d 1220, 1231 (D.C.Cir.1991) (stat-

ing that § 1962(c) "requires participation in the operation or management of the enterprise itself").

**13.** Plaintiffs claim that dismissal is inappropriate in part because subsequent discovery could reveal a greater role in the conduct of the enterprise by these two defendants sufficient to satisfy the requirements of § 1962(c). If this should be the case, although the Court thinks it unlikely, plaintiffs may seek leave to amend their complaint to add such allegations.

defendant agrees to the substantive RICO offense, regardless of whether he personally agreed to commit two predicate acts. *See United States v. Pryba*, 900 F.2d 748, 760 (4th Cir.) (citing and following cases from the Third, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits), *cert. denied*, 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990).[14] The analysis in these cases applies equally to the conduct or participation requirement. *Cf. United States v. Norton*, 867 F.2d 1354, 1358–59 (11th Cir.) (holding that even if defendant was not a member of the class of persons who could be held liable as a principal under 18 U.S.C. § 1954, " '[t]he government need only prove that [the] defendant conspired to commit the substantive RICO offense and was aware that others had done likewise' in order to support a RICO conspiracy charge.") (alterations in original) (quoting *United States v. Pepe*, 747 F.2d 632, 660 (11th Cir.1984)), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 *and cert. denied*, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). To hold that under § 1962(d) a plaintiff must show that an alleged coconspirator was capable of violating the substantive offense under § 1962(c), that is, that he participated to the extent required by *Reves*, "would add an element to RICO conspiracy that Congress did not direct." *Pryba*, 900 F.2d at 760 (discussing the effect of requiring a showing that a defendant agreed personally to commit two predicate acts).

Plaintiffs' complaint alleges the requisite amount of participation under *Reves* as to the other defendants. It also alleges that defendants Hagner and Harvey conspired with them to violate § 1962(c). Therefore, the Court finds that, depending on the factfinder's resolution of the facts, defendants Hagner or Harvey, or both, could be found liable under § 1962(d) of RICO. Given this finding, the Court still has subject matter jurisdiction over defendants Hagner and Harvey pursuant to § 1964(c) and pendent jurisdic-

tion over the common law claims. *See* 18 U.S.C. § 1964(c). Therefore, their request to be dismissed from this action for lack of jurisdiction is denied.

### Conclusion

For the reasons stated, the Court denies defendants' motion for summary judgment on statute of limitations grounds, finding that genuine issues of material fact exist. The Court also denies defendants' motion to dismiss, or for summary judgment on, the amended complaint. As to the motion by defendants Hagner and Harvey, the Court dismisses without prejudice the allegations against them in Count Three, as the amended complaint does not allege the level of participation required by *Reves*. Nevertheless, finding that they could be held liable for conspiracy to violate RICO, the Court denies their motion to dismiss the remaining counts against them. As this Opinion resolves the pending dispositive motions, the Court refers scheduling and pretrial to Magistrate Judge Kay, who already has the case for discovery.[15]

### ORDER

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that defendants' motion for summary judgment on statute of limitations grounds is denied. It hereby further is

ORDERED, that defendants' motion to dismiss the amended complaint is denied. It hereby further is

ORDERED, that defendant Hagner's and Harvey's motion to dismiss is granted in part and denied in part. It hereby further is

ORDERED, that the allegations against defendants Hagner and Harvey in Count Three of the amended complaint are dismissed without prejudice. It hereby further is

14. The Court declines to follow the minority view, essentially for the reasons stated in *Pryba*. *See id.* (citing cases from the First and Second Circuits).

15. By Order of August 23, 1991, Magistrate Judge Attridge stayed discovery which was not related to the pending dispositive motions. The then-presiding judge concurred in this stay by Order of September 5, 1991. On October 3, 1991, the case referral to Magistrate Judge Attridge ended and the case was referred to Magistrate Judge Kay for discovery only.

ORDERED, that the remaining allegations against defendants Hagner and Harvey are not dismissed. It hereby further is

ORDERED, that the case, which is already referred to Magistrate Judge Kay for discovery, is also referred to him for scheduling and pretrial.

SO ORDERED.